# EXHIBIT 1

# *INDIANA COMMERCIAL COURT*

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) SS: | |
| COUNTY OF MARION | ) | CAUSE NO: |

| | |
|---|---|
| ROBIN BARNEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ZIMMER BIOMET HOLDINGS, INC., | ) |
| | ) |
| Defendant. | ) |

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff Robin Barney ("Barney"), by counsel, files this Complaint and Demand for Jury Trial against Defendant Zimmer Biomet Holdings, Inc. ("Zimmer Biomet") pursuant to Indiana state common law.

## I.  PARTIES, VENUE, AND JURISDICTION

1.  Barney is a citizen of Indiana and resident of Syracuse, Kosciusko County, Indiana.

2.  Zimmer Biomet is a domestic corporation organized and incorporated under the laws of Delaware with its principal place of business located in Warsaw, Kosciusko County, Indiana.

3.  Pursuant to Rule 2 of the Interim Commercial Court Rules, this case is eligible for assignment to the Commercial Court Docket, and venue is proper in the Marion County Commercial Court.

4.  Barney initially filed an action in the United States District Court for the Northern District of Indiana, South Bend Division, under Cause No. 3:17-cv-616, bringing federal law

claims under the Equal Pay Act, 29 U.S.C. § 206(d), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and including her related state law claims (breach of contract and wrongful constructive discharge) pursuant to supplemental jurisdiction.

5.      On November 26, 2018, the Northern District Court dismissed Plaintiff's state law breach of contract claim related to her employment agreement, and state law wrongful constructive discharge claim, without prejudice. Barney's federal law claims remain pending in the Northern District of Indiana.

6.      Plaintiff now brings her state law claims, which were dismissed from her federal case without prejudice, in this Court.

7.      Pursuant to Ind. Code § 34-11-8-1, Plaintiff's claims are timely because they have been brought within three (3) years after the date of the Northern District Court's dismissal, without prejudice.

## II.      FACTUAL ALLEGATIONS

### Background

8.      Barney hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

9.      Barney became the Senior Vice President of Operations of Biomet, Inc. on September 2, 2008.

10.     On September 2, 2008, Barney entered into an Employment Agreement with Biomet, Inc., attached hereto as Exhibit A.

11.     Biomet, Inc. merged with Zimmer Holdings, Inc. to become Zimmer Biomet Holdings, Inc. ("Zimmer Biomet") on June 24, 2015.

12.     As a result of the merger, Barney became the Senior Vice President of Global Operations and Logistics at Zimmer Biomet.

**Relocation to Switzerland**

13.     Around August of 2016, Zimmer Biomet's Senior Vice President of Human Resources, Bill Fisher, informed Barney that her job would be moved from Warsaw, Indiana to Switzerland, requiring her relocation by the end of 2017.

14.     On September 9, 2016, Zimmer Biomet's Senior Vice President of Human Resources, Bill Fisher, asked Barney whether she would in fact relocate to Switzerland, indicating that the Chief Executive Officer needed an answer. Barney stated that she needed time to think about it.

15.     Barney's Employment Agreement with Biomet, Inc. includes a change in control provision, which entitles Barney to a substantial payout should she be terminated by the company without "Cause," or terminate her own employment for "Good Reason" (which includes a relocation of her primary work location more than 50 miles away), within two years of the June 24, 2015, change in control event at Biomet.

16.     Barney later informed Zimmer Biomet's Senior Vice President of Human Resources that she did not wish to relocate to Switzerland, and was left to conclude that her employment would therefore be terminated before the end of 2017, and that the company would pay her the lucrative severance package provided for in her Employment Agreement, in the event of a mandatory relocation within two years of a Change In Control Event.

**FDA Inspection**

17.     On September 12, 2016, the U.S. Food and Drug Administration ("FDA") began an inspection of Zimmer Biomet's Warsaw North Campus (the "North Campus").

3

18.     It was clear after the first few weeks of the FDA inspection that it was not going well.

19.     Barney's working conditions became increasingly intolerable. For example, Dave Kunz, Zimmer Biomet's SVP of Global Quality and Regulatory Affairs ("Kunz"), was having shouting matches with Barney regularly, and openly blaming her for FDA inspection issues, accusing her of not holding people accountable, and questioning her judgment and clear thinking.

20.     On or about September 29, 2016, the company shut down production from the North Campus, in order to satisfy the FDA that progress was being made toward resolving issues from initial audit findings and to accelerate remediation efforts. Barney openly disagreed with this action.  Kunz gained Dvorak's approval to shut down production of the North Campus over Barney's objections.

21.     On Friday, October 21, 2016, Dvorak coached Barney to implement personnel changes within her organization, describing them as adjustments that were needed in light of the specific circumstances presented by the North Campus and the FDA inspection.

22.     Less than twenty-four hours after the coaching session, by email message on Saturday, October 22, 2018, Dvorak asked Barney for a description of the organizational changes she planned to make to address North Campus matters.  Dvorak described the organizational changes as "necessary" and specifically linked them to the company's anticipated response to an inquiry from the FDA in the context of the inspection.

23.     On October 26, 2016, Dvorak again contacted Barney asking for an update on the "organizational changes" that he was pushing her to make, and he notified Fisher of his follow up with Barney on that topic.

24.     Later on October 26, 2016, Barney communicated her proposed organizational changes to Dvorak, Fisher and others, via email.  Barney proposed a reorganization that moved personnel into different roles and responsibilities, but did not include terminations "for cause" of any employees in her reporting structure.

25.     After Barney communicated her proposed organizational changes, at 5:31 a.m. on October 28, 2016, Fisher told her not to implement any changes within her organization until Dvorak reviewed them.

26.     Later the same day, October 28, 2016, Fisher also told Barney that Dvorak had responded with feedback that he "continues to want accountability," which Barney understood to mean that only terminations of personnel "for cause" would be sufficient to satisfy Dvorak. Barney further understood that Dvorak wanted terminations that could be reported to the FDA as holding employees accountable for the inspection findings.

27.     By this time, Barney had been made aware that Kunz was moving forward with terminations of Rex White (Vice President of Quality Assurance) and Rich Castaneda (Quality Assurance Director) on October 28, 2016.

28.     Finally, Fisher informed Barney that Dvorak likely would not have time to discuss these organizational changes in the next few days, but would have that conversation at the performance discussion set for November 2, 2016, after the investor call.

29.     On Friday, October 28, 2016, Dvorak called Barney's cellular telephone and instructed Barney to make immediate, significant organizational changes within Operations, to address issues raised in the ongoing FDA audit.

30.     Dvorak ordered Barney to make "significant organizational changes", meaning to terminate employees in her reporting structure, so that the company could point to those

terminated employees as people who were accountable for problems identified in the FDA inspection.

31.     Barney refused to terminate any employees for cause as a result of the FDA audit, because it would result in employees being terminated "for cause" under a false pretext and would be a material misrepresentation to the FDA.

32.     Based upon what she had been instructed to do by the Chief Executive Officer in response to the ongoing FDA audit, Barney reasonably expected that if she complied with the instruction to terminate employees "for cause" in response to the FDA audit, when there was no basis for a "for cause" termination of those employees related to the issues uncovered by the FDA audit, she could be personally and criminally liable for making a false representation to the FDA under 18 U.S.C. § 1001(a).

33.     Dvorak stated that he was not happy with Barney's refusal. This conversation and related email messages from Fisher and Dvorak, conveyed to Barney that the matter would be discussed further during the in-person "performance discussion" between Dvorak and Barney set for Wednesday, November 2, 2016, after the investor call.

34.     Based upon her prior interactions with Dvorak, Barney understood that if she did not take immediate action to terminate employees under a false pretext in response to the FDA audit, she would be fired as soon as Dvorak had a chance to speak with her after the investor call.

35.     Kunz informed the FDA auditors, during the next opening audit meeting, that significant organizational changes had been made by the company, holding people accountable for the audit results to date.  In that meeting, he included the terminations of Rex White, Rich Castaneda, and Robin Barney as examples of the organizational changes made. The company

represented to the FDA that it made these organizational changes to address the FDA audit findings.

## Q3 2016 Investor Call

36.     On or about October 25, 2016, Zimmer Biomet's Chief Financial Officer Daniel Florin ("Florin") demanded that Barney concoct a "story" about the root cause of the 2016 Q3 shortfalls in sales, to mislead Zimmer Biomet investors on an upcoming investor call that would take place the next week, on Monday, October 31, 2016.

37.     Florin asked Barney to create a story to show that the Q3 sales shortfall was sudden and unanticipated, to blame it on supply chain issues, and to explain why it was not disclosed to investors sooner.

38.     The Q3 sales shortfall was no surprise and was not unanticipated, based upon weekly reports to the Operating Committee about supply chain issues, and several audits which had been conducted within the previous 12 months.

39.     Florin also stated that he wanted to remain silent on the upcoming call about the FDA audit, meaning that Zimmer Biomet would not inform investors about the ongoing FDA inspection, even though it began during Q3, and even though the company had ordered a complete shutdown of production at North Campus during Q3.

40.     Barney felt that failure to disclose the FDA audit on the investor call would also amount to a material misrepresentation, as the audit had caused a complete disruption in production and sales.

41.     Based upon what she had been instructed to do by the Chief Financial Officer in preparation for the Q3 earnings call, Barney reasonably expected that if she complied with the instruction to mislead investors, she could be personally liable for violations of Sections 10(b)

and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

42.     Barney refused to participate in making material misrepresentations to the investors, and left the meeting.

43.     Barney believes that Dvorak also knew about her refusal to create a false narrative for the upcoming investor call, because of Dvorak's close working relationship with Florin and her regular one-on-one meetings with Dvorak, during which the well-known issues at the North Campus were discussed.

44.     On the October 31, 2016, investor call, Dvorak and Florin did not mention the FDA audit, and represented that the Q3 sales shortfall was the result of unanticipated supply chain issues.

### Barney's Forced Resignation

45.     Based upon the way she was being treated by Dvorak, Florin and Kunz, Barney experienced trouble eating, trouble sleeping, episodes of crying, and extreme anxiety, to the point where she sought help from an Employee Assistance Program counselor in October 2016.

46.     Based on Dvorak's treatment of her, Barney reasonably expected that she would be fired during the scheduled November 2, 2016, meeting, for refusing the CEO's directive to terminate employees in her reporting structure under false pretenses, and for refusing the CFO's directive to concoct a story about "unanticipated" supply chain issues to mislead investors.

47.     Barney reasonably believed that Dvorak was waiting until after the October 31, 2016, investor call to fire her, in order to use her as a scapegoat when the call went poorly. Barney also reasonably believed that she would be terminated shortly after the call.

48.     The work conditions for Barney at Zimmer Biomet had become so intolerable that Barney had no other option, but to resign.  She had been placed in the impossible position of sticking around long enough to be implicated in securities fraud, and then being fired, or resigning before the October 31, 2016, investor call.

49.     Barney felt that she had no choice but to resign, or be forced to participate in unethical and fraudulent business practices, potentially exposing herself to personal legal liability.

50.     On October 28, 2016, Zimmer Biomet terminated two other senior leaders (Rex White and Rich Castaneda).

51.      After her morning telephone call with Dvorak, later the day of October 28, 2016, Barney submitted her two-week's notice of "resignation" via email, which would be effective November 11, 2016.

52.     In Barney's "resignation" email, she states that the "current issues at North Campus are not the 'fault' of one individual or organization." Rather, the issues were well known to senior management soon after the close of the merger, and were "further understood and documented via several audits over the last 12 months."

53.     Barney was constructively discharged and forced to resign from Zimmer Biomet, effective November 11, 2016, instead of being fired and possibly prosecuted for securities fraud and/or making false statements to the FDA.

54.     It was well known by other employees within Zimmer Biomet that, although Barney submitted her own resignation, she did not truly resign, but was forced out of the company.

55.     After the FDA inspection concluded in November, 2016, Zimmer Biomet provided a written response to the FDA's 483 inspection findings – the "FDA Letter". The FDA Letter specifically identified Barney as a reason for the poor quality culture at that site. She was the most senior executive specifically named in that document, and the company noted that it chose to replace her with a legacy Zimmer employee.

56.     Barney's Employment Agreement includes a change in control provision, which entitles Barney to a substantial payout should she be terminated by the company without "Cause," or terminate her own employment for "Good Reason" (including being required to relocate), within two years of the June 24, 2015, change in control event at Biomet.

57.     At the time of Barney's termination, Barney had "Good Reason" to terminate her own employment, pursuant to her Employment Agreement.

58.     Zimmer Biomet did not have "Cause," as defined in the Employment Agreement, to terminate Barney's employment.

59.     Zimmer Biomet constructively discharged Barney, effectively terminating her employment without "Cause," despite her apparent resignation.

60.     Zimmer Biomet refused to provide any severance pay or benefits to Barney upon her termination, claiming that the change in control provision in Barney's Employment Agreement only applies if Barney is terminated by the company.

61.     Barney requested severance pay and benefits and requested an agreement from the company providing those benefits. The company refused to provide a release agreement providing for the benefits and incorporating a release of claims from Barney.

### III.     LEGAL ALLEGATIONS

### COUNT I: Breach of Contract – Employment Agreement

62.     Barney hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

63.     Zimmer Biomet, in forcing Barney to terminate employees under false pretexts and to make material misrepresentations to investors, left Barney with no other choice, but to resign.

64.     Repeatedly informing Barney that she would be required to relocate her family from Indiana to Switzerland left Barney with no other choice, but to resign.

65.     Barney was constructively discharged from Zimmer Biomet, without cause, effective November 11, 2016.

66.     The termination of Barney's employment also constitutes a termination by the Executive for Good Reason, within the meaning of Barney's employment agreement.

67.     The termination of Barney's employment occurred within two years following a "Change of Control," as defined by Barney's employment agreement.

68.     Zimmer Biomet breached Barney's employment agreement by failing to provide her "Change of Control Severance Benefit" resulting from Zimmer Biomet's constructive termination of her employment.

69.     Zimmer Biomet breached Barney's employment agreement by failing to provide her "Change of Control Severance Benefit" resulting from Barney's termination of employment for "Good Reason."

70.     Zimmer Biomet never provided Barney with a release agreement to sign in connection with her requests for Change in Control Severance Benefits.

71.     Barney has suffered damages as a result of Zimmer Biomet's breach.

**COUNT II:   Wrongful Constructive Discharge**

72.    Barney hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

73.    Zimmer Biomet created a hostile work environment by ordering Barney to assist in materially misleading investors, which could subject her to personal criminal and/or civil liability.

74.    Zimmer Biomet continued to create a hostile work environment by repeatedly demanding that Barney terminate employees under her supervision under a false pretext.

75.    Zimmer Biomet continued to create a hostile work environment by pressuring Barney about sales and product shipments during the FDA audit of the North Campus when by the end of September, all production had to be shut down in response to FDA findings.

76.    By October 28, 2016, the work conditions for Barney at Zimmer Biomet had become so intolerable that Barney had no other option, but to resign.  She had refused an order to mislead investors and commit securities fraud.

77.    By October 28, 2016, Barney had refused an order to terminate employees "for cause" when those employees had done nothing to warrant termination for cause.  Barney understood, based on communications from Dvorak and Fisher, that the company wanted her to terminate employees "for cause" to show "accountability" to the FDA for problems identified in the FDA inspection.

78.    Zimmer Biomet created a hostile work environment by ordering Barney to terminate employees "for cause" to show accountability to the FDA for the audit, which could subject her to personal criminal and/or civil liability for making misrepresentations to the FDA.

79.     Barney reasonably expected to be terminated at the scheduled November 2, 2016, meeting, for refusing to comply with these direct orders from the Chief Financial Officer and Chief Executive Officer.

80.     Barney had no other option, but to comply with the orders of Zimmer Biomet's CEO, the highest level officer in the company, or to resign from employment before the investor call took place on October 31, 2016.

81.     Dvorak had effectively communicated that if Barney did not comply with the directives of the CFO and CEO, she would be fired.

82.     Barney was constructively discharged when she was forced to either resign, or participate in a fraudulent scheme which could expose her to potential personal liability.

83.     Barney was constructively discharged for her refusal to assist in making material misrepresentations to investors which violated public policy.

84.     Barney was constructively discharged for her refusal to comply with instructions to wrongfully terminate employees "for cause" to show the FDA that the company was holding employees "accountable."

85.     Zimmer Biomet's own corporate response to the FDA audit clearly identifies Barney as a reason for the poor FDA results.  Zimmer Biomet clearly intended to terminate Barney's employment.

86.     Barney has suffered damages as a result of this wrongful discharge.

## IV.     RELIEF REQUESTED

Barney requests the following relief:

a.      All wages and other economic benefits lost as a result of Defendant's unlawful actions, including, but not limited to, severance pay;

13

b.      Compensatory damages;

c.      Liquidated damages;

d.      Punitive damages;

e.      Damages for emotional distress, mental anguish, and pain and suffering;

f.      All costs and reasonable attorney fees incurred in litigating this action;

g.      Pre-judgment and post-judgment interest; and

h.      Any and all other legal and/or equitable relief to which Barney is entitled.

Respectfully submitted,


*/s/ Kathleen A. DeLaney*_____
Kathleen A. DeLaney (#18604-49)
Annavieve C. Conklin (#33875-32)
*Attorneys for Plaintiff Robin Barney*

DeLANEY & DeLANEY LLC
3646 N. Washington Blvd.
Indianapolis, IN  46205

## JURY DEMAND

Plaintiff, Robin Barney, by counsel, hereby demands a trial by jury on all issues so triable.

Respectfully submitted,


*/s/ Kathleen A. DeLaney*_____
Kathleen A. DeLaney (#18604-49)
Annavieve C. Conklin (#33875-32)
*Attorneys for Robin Barney*

**49D01-1905-PL-017966**

Filed: 5/2/2019 11:48 AM
Clerk
Marion County, Indiana

EX-10.18 to d391097dex1018.htm EX-10.18

USDC IN/ND case 3:19-cv-00542-JD-MGG document 1-11 filed 05/14/19 page 16 of 35

**Exhibit 10.18**

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("Agreement"), dated as of September 2, 2008 (the "Effective Date"), is made by and between Biomet, Inc., an Indiana corporation (the "Company"), and Robin T. Barney (the "Executive").

WHEREAS, the Company desires to engage the Executive, and the Executive desires to be engaged by the Company, as Senior Vice President of Operations, Biomet Inc.; and

WHEREAS, the Company and the Executive desire to enter into this Agreement to set out the terms and conditions for the employment relationship of the Executive with the Company;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto agree as follows:

1. Employment Agreement. On the terms and conditions set forth in this Agreement, the Company agrees to employ the Executive and the Executive agrees to be employed by the Company for the Employment Period set forth in Section 2 and in the positions and with the duties set forth in Section 3. Terms used herein with initial capitalization not otherwise defined are defined in Section 23.

2. Term. The initial term of employment under this Agreement shall be for a three-year period commencing on the Effective Date (the "Initial Term"). The term of employment shall be automatically extended for an additional consecutive 12-month period (the "Extended Term") on the first anniversary of the Effective Date and each subsequent anniversary of the Effective Date, unless and until the Company or Executive provides written notice to the other party in accordance with Section 11 hereof not less than 90 days before such anniversary date that such party is electing not to extend the term of employment under this Agreement ("Non-Renewal"), in which case the term of this Agreement shall end as of the end of such Initial Term or Extended Term, as the case may be, unless sooner terminated as hereinafter set forth. Such Initial Term and all such Extended Terms are collectively referred to herein as the "Employment Period."

3. Position and Duties. During the Employment Period, the Executive shall serve as Senior Vice President of Operations, Biomet Inc. In such capacity, the Executive shall report to the Company's Chief Executive Officer. During the Employment Period, the Executive shall have the powers and authority customarily exercised by individuals serving as Senior Vice President of Operations of a company of the size and nature of the Company. The Executive shall devote the Executive's reasonable best efforts and full business time to the performance of the Executive's duties hereunder and the advancement of the business and affairs of the Company; provided that the Executive shall be entitled to serve as a member of the board of directors of another company approved by the Board, to serve on civic, charitable, educational, religious, public interest or public service boards approved by the Board, and to manage the Executive's personal and family investments, in each case, to the extent such activities do not, individually or in the aggregate, materially interfere with the performance of the Executive's duties and responsibilities hereunder.

4. <u>Place of Performance</u>. During the Employment Period, the Executive shall be based primarily at the principal executive offices of the Company in Warsaw, Indiana, except for reasonable travel on the Company's business consistent with the Executive's position.

5. <u>Compensation and Benefits</u>

(a) <u>Base Compensation</u>. During the Employment Period, the Company shall pay to the Executive a base salary (the "<u>Base Salary</u>") at the rate of no less than $275,000 per year. The Base Salary shall be reviewed for increase by the Company no less frequently than annually and shall be increased in the discretion of the Company and any such adjusted Base Salary shall constitute "Base Salary" for purposes of this Agreement. The Base Salary shall be paid in substantially equal installments in accordance with the Company's regular payroll procedures.

(b) <u>Annual Bonus</u>. The Executive shall be given the opportunity to earn an annual incentive bonus for each fiscal year that ends during the Employment Period in accordance with the annual bonus plan generally applicable to the Company's executive officers, as the same may be in effect from time to time (the "<u>Annual Plan</u>"). The Executive's target annual incentive bonus opportunity under the Annual Plan shall be no less than 80% of the Executive's Base Salary for on-target performance with the possibility of exceeding 80% for high achievement. The actual amount payable to the Executive as an annual bonus under the Annual Plan shall be dependent upon the achievement of performance objectives established in accordance with the Annual Plan by the Board or the compensation committee of the Board (or its successor committee) (the "<u>Compensation Committee</u>"). Any bonus payable pursuant to this Section 5(b) shall be paid at the same time annual bonuses are payable to other officers of the Company in accordance with the terms of the Annual Plan.

(c) <u>Vacation; Benefits</u>. During the Employment Period, the Company shall provide to the Executive employee benefits and perquisites on a basis that is no less favorable than that provided to other senior officers of the Company, including participation in the Company's deferred compensation plan (if any), as in effect from time to time. Subject to the terms of this Agreement, all benefits are provided at the Company's sole discretion. Subject to the terms of this Agreement, the Company shall have the right to change insurance carriers and to adopt, amend, terminate or modify employee benefit plans and arrangements at any time and without the consent of the Executive.

6. <u>Expenses</u>. The Executive is expected and is authorized to incur reasonable expenses in the performance of her duties hereunder. The Company shall reimburse the Executive for all such expenses reasonably and actually incurred in accordance with policies which may be adopted from time to time by the Company promptly upon periodic presentation by the Executive of an itemized account, including reasonable substantiation, of such expenses.

7. <u>Confidentiality, Non-Disclosure and Non-Competition Agreement</u>. The Company and the Executive acknowledge and agree that during the Executive's employment with the Company, the Executive will have access to and may assist in developing Company Confidential Information and will occupy a position of trust and confidence with respect to the Company's affairs and business and the affairs and business of the Company's Affiliates. The Executive agrees that the following obligations are necessary to preserve the confidential and proprietary nature of Company Confidential Information and to protect the Company and its Affiliates against harmful solicitation of employees and customers, harmful competition and other actions by the Executive that would result in serious adverse consequences for the Company and its Affiliates:

(a) <u>Non-Disclosure</u>. During the Executive's employment with the Company and thereafter, the Executive will not knowingly use, disclose or transfer any Company Confidential Information other than as authorized in writing by the Company or within Executive's good faith interpretation of the scope of the Executive's duties. Anything herein to the contrary notwithstanding, the provisions of this Section 7(a) shall not apply (i) when disclosure is required by law or by any court, arbitrator, mediator or administrative or legislative body (including any committee thereof) with actual or apparent jurisdiction to order the Executive to disclose or make accessible any information; or (ii) to information that becomes generally known to the public or within the relevant trade or industry other than due to the Executive's violation of this Section 7(a).

(b) <u>Materials</u>. The Executive will not remove any Company Confidential Information or any other property of the Company or any of its Affiliates from the Company's premises or make copies of such materials except for normal and customary use in the Company's business. The Company acknowledges that the Executive, in the ordinary course of her duties, routinely uses and stores Company Confidential Information at home and other locations. The Executive will return to the Company all Company Confidential Information and copies thereof and all other property of the Company or any of its Affiliates at any time upon the request of the Company and in any event promptly after termination of Executive's employment. The Executive agrees to attempt in good faith to identify and return to the Company any copies of any Company Confidential Information after the Executive ceases to be employed by the Company. Anything to the contrary notwithstanding, nothing in this Section 7 shall prevent the Executive from retaining a home computer, papers and other materials of a personal nature (including diaries and calendars), information relating to her compensation or relating to reimbursement of expenses, information that she reasonably believes may be needed for tax purposes, and copies of plans, programs and agreements relating to her employment.

(c) <u>No Solicitation or Hiring of Employees</u>. During the Non-Compete Period, the Executive shall not solicit, entice, persuade or induce any individual who is employed by the Company or any of its Affiliates (or who was so employed within 180 days prior to the Executive's action) to terminate or refrain from continuing such employment or to become employed by or enter into contractual relations with any other individual or entity other than the Company or any of its Affiliates, and the Executive shall not, directly or indirectly, hire, or participate in the hiring, as an employee, consultant or otherwise, any such Person.

(d) <u>Non-Competition</u>.

(i) During the Non-Compete Period, the Executive shall not, directly or indirectly, (A) solicit or encourage any client or customer of the Company or any of its Affiliates, or any Person who was a client or customer within 180 days prior to Executive's action to terminate, reduce or alter in a manner adverse to the Company, any existing business arrangements with the Company or any of its Affiliates or to transfer existing business from the Company or any of its Affiliates to any other Person, (B) provide services to any entity that competes with the Company or its Affiliate in the United States or any other jurisdiction in which the Executive has any responsibility during her employment hereunder or that provides a product or service competitive with any product or service provided by the Company or its Affiliate or (C) own an interest in any entity described in subsection (B) immediately above; provided, however, that Executive may own, as a passive investor, securities of any such entity that has outstanding publicly traded securities so long as her direct holdings in any such entity shall not in the aggregate constitute more than 2% of the voting power of such entity. The Executive agrees that, before providing services, whether as an employee or consultant, to any entity during the Non Compete Period, she will provide a copy of this Agreement to such entity and acknowledge, to the Company in writing, that she has done so. Notwithstanding the foregoing, nothing in this Section 7 shall prevent the Executive from providing services to a division or a subsidiary of an entity that does not compete with the Company or any of its Affiliates and that does not provide products or services competitive with products or services provided by the Company or any of its Affiliates even if other divisions or subsidiaries of that entity compete with the Company so long as the Executive does not have any managerial or supervisory authority with respect to such competitive division or subsidiary. The Executive acknowledges that this covenant has a unique, very substantial and immeasurable value to the Company, that the Executive has sufficient assets and skills to provide a livelihood for the Executive while such covenant remains in force and that, as a result of the foregoing, in the event that the Executive breaches such covenant, monetary damages would be an insufficient remedy for the Company and equitable enforcement of the covenant would be proper. The Executive further covenants that she shall not challenge the reasonableness of any of the covenants set forth in this Section 7, but reserves the right to challenge the Company's interpretation of such covenants.

(ii) If the restrictions contained in Section 7(d)(i) shall be determined by any court of competent jurisdiction to be unenforceable by reason of their extending for too great a period of time or over too great a geographical area or by reason of their being too extensive in any other respect, Section 7(d)(i) shall be modified to be effective for the maximum period of time for which it may be enforceable and over the maximum geographical area as to which it may be enforceable and to the maximum extent in all other respects as to which it may be enforceable.

(e) <u>Publicity</u>. During the Employment Period, the Executive hereby grants to the Company the right to use, in a reasonable and appropriate manner, the Executive's name and likeness, without additional consideration, on, in and in connection with technical, marketing or disclosure materials, or any combination thereof, published by or for the Company or any of its Affiliates.

4

(f) <u>Conflicting Obligations and Rights</u>. The Executive represents and warrants that she is not subject to agreement or contractual commitment that prevents or in any way limits her ability to fully discharge her duties and responsibilities hereunder and that she is not in possession of any confidential or proprietary information of another Person that will be used in connection with the discharge of her duties hereunder. The Executive acknowledges and agrees that the accuracy of the foregoing representation and warranty is a condition precedent to the enforceability of the Company's obligations hereunder.

(g) <u>Enforcement</u>. The Executive acknowledges that in the event of any breach of this Section 7, the business interests of the Company and its Affiliates will be irreparably injured, the full extent of the damages to the Company and its Affiliates will be impossible to ascertain, monetary damages will not be an adequate remedy for the Company and its Affiliates, and the Company will be entitled to enforce this Agreement by a temporary, preliminary and/or permanent injunction or other equitable relief, without the necessity of posting bond or security, which the Executive expressly waives. The Executive understands that the Company may waive some of the requirements expressed in this Agreement, but that such a waiver to be effective must be made in writing and should not in any way be deemed a waiver of the Company's right to enforce any other requirements or provisions of this Agreement. The Executive agrees that each of the Executive's obligations specified in this Agreement is a separate and independent covenant and that the unenforceability of any of them shall not preclude the enforcement of any other covenants in this Agreement.

8. <u>Termination of Employment</u>. The Executive's employment hereunder may be terminated during the Employment Period under the following circumstances:

(a) <u>Death</u>. The Executive's employment hereunder shall terminate upon the Executive's death;

(b) <u>By the Company</u>. The Company may terminate the Executive's employment for:

(i) <u>Disability</u>. If the Executive shall have been substantially unable to perform the Executive's material duties hereunder by reason of illness, physical or mental disability or other similar incapacity, which inability shall continue for 90 consecutive days or 180 non-consecutive days in any 24-month period and which qualified Executive for long term disability coverage under applicable Company disability plans (a "<u>Disability</u>");

(ii) <u>Cause</u>. The Company may terminate the Executive's employment for Cause as defined herein; or

(iii) <u>Without Cause</u>. The Company may terminate the Executive's employment without Cause at any time upon not less than 90 days notice to the Executive. The Company's Non-Renewal of the Initial Term or the Extended Term shall constitute a termination of the Executive's employment by the Company without Cause, and the Company's notice of Non-Renewal pursuant to Section 2 hereof shall constitute notice of termination without Cause for purposes of this Section 8(b)(iii). Notwithstanding the foregoing, the Company's Non-Renewal of the Initial Term or the Extended Term shall constitute a termination of the Executive's employment by the Company without Cause only if the Company determines that a "separation from service" within the meaning of Treasury Regulation 1.409A-1(h) has occurred.

(c) By the Executive. The Executive may terminate her employment with or without Good Reason upon not less than 90 days notice to the Company. The Executive's Non-Renewal of the Initial Term or the Extended Term shall constitute a termination of employment by the Executive without Good Reason, and the Executive's notice of Non-Renewal pursuant to Section 2 hereof shall constitute notice of the Executive's termination of her employment for purposes of this Section 8(c). During this 90-day notice period, the Company may, without breaching this Agreement or constituting Good Reason or a Termination without Cause, relieve the Executive of her positions, titles, duties and responsibilities and direct the Executive to cease appearing on Company property. Notwithstanding the foregoing, the Executive's Non-Renewal of the Initial Term or the Extended Term shall constitute a termination of employment by the Executive without Good Reason only if the Company determines that a "separation from service" within the meaning of Treasury Regulation 1.409A-1(h) has occurred.

(d) Notice of Termination. Any termination of the Employment Period, other than pursuant to the Executive's death, shall be effected by delivery to the other party of a notice of termination (a "Notice of Termination") from the party terminating the Employment Period.

(e) Other Resignations. Upon any termination of the Executive's employment, she shall automatically resign, and shall automatically be deemed to have resigned, from all positions with the Company and its Affiliates.

9. Compensation Upon Termination.

(a) Death. If the Executive's employment is terminated during the Employment Period as a result of the Executive's death, this Agreement and the Employment Period shall terminate without further notice or any action required by the Company or the Executive's legal representatives. Upon the Executive's death, the Company shall pay or provide the following: (i) the Company shall pay to the Executive's legal representative or estate, as applicable, the Executive's Base Salary due through the Executive's Date of Termination; (ii) the Company shall pay to the Executive's legal representative or estate, as applicable, a pro rated portion (based on the percentage of the Company's fiscal year preceding the Executive's Date of Termination) of the amount equal to the average of (x) the annual incentive bonus earned by the Executive for the fiscal year immediately preceding the fiscal year that contains the Date of Termination and (y) the annual incentive bonus the Executive would have received for the fiscal year that contains the Date of Termination if her employment had not been terminated, as determined by the Board based on the Company's performance to the Date of Termination extrapolated through the end of such fiscal year; and (iii) the Company shall pay, at the time when such payments are due, to the Executive's legal representative or estate, as applicable, the Accrued Benefits and the rights of the Executive's legal representative or estate with respect to any equity or equity-related awards shall be governed by the applicable terms of the related plan or award agreement. The total amount of the pro rated bonus described in clause (ii) of the preceding sentence will be paid in a lump sum at the time the Company pays annual incentive bonuses under the Annual Plan to its similarly situated active employees for the fiscal year that contains the Date of Termination. Except as set forth herein, the Company shall have no further obligation to the Executive under this Agreement.

6

(b) <u>Disability</u>. If the Company terminates the Executive's employment during the Employment Period because of the Executive's Disability pursuant to Section 8(b)(i), (i) the Company shall pay to the Executive or the Executive's legal representative, as applicable, the Executive's Base Salary due through the Executive's Date of Termination, (ii) the Company shall pay to the Executive or the Executive's legal representative, as applicable, a pro rated portion (based on the percentage of the Company's fiscal year preceding the Executive's Date of Termination) of the amount equal to the average of (x) the annual incentive bonus earned by the Executive for the fiscal year immediately preceding the fiscal year that contains the Date of Termination and (y) the annual incentive bonus the Executive would have received for the fiscal year that contains the Date of Termination if her employment had not been terminated, as determined by the Board based on the Company's performance to the Date of Termination extrapolated through the end of such fiscal year; and (iii) the Company shall pay to the Executive or the Executive's legal representative, as applicable, at the time when such payments are due, the Accrued Benefits and the rights of the Executive or the Executive's legal representative, as applicable, with respect to any equity or equity-related awards shall be governed by the applicable terms of the related plan or award agreement. The total amount of the pro rated bonus described in clause (ii) of the preceding sentence will be paid in a lump sum at the time the Company pays annual incentive bonuses under the Annual Plan to its similarly situated active employees for the fiscal year that contains the Date of Termination. Except as set forth herein, the Company shall have no further obligation to the Executive under this Agreement.

(c) <u>Certain Terminations by the Company or Voluntarily by the Executive</u>. If, during the Employment Period, the Company terminates the Executive's employment for Cause or the Executive voluntarily terminates her employment other than for Good Reason, the Company shall pay to the Executive the Executive's Base Salary due through the Date of Termination and all Accrued Benefits, if any, to which the Executive is entitled as of the Date of Termination, at the time such payments are due, and the Executive's rights with respect to any equity or equity-related awards shall be governed by the applicable terms of the related plan or award agreement.

(d) <u>Termination by the Company Other Than For Cause, Death or Disability, or by the Executive for Good Reason, Prior to a Change of Control</u>. If the Company terminates the Executive's employment during the Employment Period other than for Cause and other than due to the Executive's death or Disability, or if Executive terminates the Executive's employment during the Employment Period for Good Reason, in either case at any time other than during the two-year period following a Change of Control, then

(i) Executive shall be entitled to an amount equal to 1.5 times the Executive's Base Salary in effect at the Date of Termination (the "<u>Severance Benefit</u>"). The total amount of the Severance Benefit will be paid in equal, ratable installments in accordance with the Company's regular payroll policies over the course of the Non-Compete Period;

7

(ii) Executive shall be entitled to a pro rated portion (based on the percentage of the Company's fiscal year preceding the Executive's Date of Termination) of the annual incentive bonus the Executive would have received for the fiscal year that contains the Date of Termination if her employment had not been terminated, as determined by the Board based on the Company's performance to the Date of Termination extrapolated through the end of such fiscal year. The total amount of the pro rated bonus described in the preceding sentence will be paid in a lump sum at the time the Company pays annual incentive bonuses under the Annual Plan for such fiscal year to its similarly situated active employees;

(iii) If the Executive is eligible for and elects continuation coverage pursuant to COBRA (with respect to the Executive and/or the Executive's dependents who are eligible to elect COBRA under the Company's group health plan(s) as a direct result of the Executive's termination of employment), the Company shall pay (as of the first of each applicable month) the premiums for such coverage (or reimburse the Executive for such premiums) until the earlier to occur of (x) the end of the Non-Compete Period or (y) the date the Executive becomes eligible for coverage under another group health plan;

(iv) The Company shall pay to the Executive, at the time when such payments are due, the Accrued Benefits; and

(v) The rights of the Executive with respect to any equity or equity-related awards shall be governed by the applicable terms of the related plan or award agreement.

(e) Termination by the Company Other Than For Cause, Death or Disability, or by the Executive for Good Reason, Following a Change of Control. If the Company terminates the Executive's employment during the Employment Period other than for Cause and other than due to the Executive's death or Disability, or if Executive terminates the Executive's employment during the Employment Period for Good Reason, in either case within the two-year period following a Change of Control, then:

(i) Executive shall be entitled to an amount equal to (A) 2 times the Executive's Base Salary in effect at the Date of Termination plus (B) 2 times the amount equal to the average of (x) the annual incentive bonus earned by the Executive for the fiscal year immediately preceding the fiscal year that contains the Date of Termination and (y) the annual incentive bonus the Executive would have received for the fiscal year that contains the Date of Termination if her employment had not been terminated, as determined by the Board based on the Company's performance to the Date of Termination extrapolated through the end of such fiscal year (the "Change of Control Severance Benefit"). The total amount of the Change of Control Severance Benefit will be paid in a lump sum as soon as administratively practicable following the Date of Termination;

8

(ii) Executive shall be entitled to a pro rated portion (based on the percentage of the Company's fiscal year preceding the Executive's Date of Termination) of the Executive's target annual incentive bonus under the Annual Plan for the fiscal year that contains the Date of Termination. The total amount of the pro rated bonus described in the preceding sentence will be paid in a lump sum at the time the Company pays annual incentive bonuses under the Annual Plan for such fiscal year to its similarly situated active employees;

(ii) If the Executive is eligible for and elects continuation coverage pursuant to COBRA (with respect to the Executive and/or the Executive's dependents who are eligible to elect COBRA under the Company's group health plan(s) as a direct result of the Executive's termination of employment), the Company shall pay (as of the first of each applicable month) the premiums for such coverage (or reimburse the Executive for such premiums) until the earlier to occur of (x) the end of the Non-Compete Period or (y) the date the Executive becomes eligible for coverage under another group health plan;

(iv) The Company shall pay to the Executive, at the time when such payments are due, the Accrued Benefits; and

(v) The rights of the Executive with respect to any equity or equity-related awards shall be governed by the applicable terms of the related plan or award agreement.

(f) <u>Delay in Payments</u>. Notwithstanding the preceding provisions or any provision in this Agreement to the contrary, all payments pursuant hereto (if any) are intended to comply with Code Section 409A of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>") and the guidance thereunder, and this Agreement shall be construed accordingly. To the extent that compliance with Section 409A(a)(2)(B) would require any payment otherwise provided for by this Agreement to be delayed for six months, such payment shall be made as soon as administratively practicable after the end of such six-month period.

(g) <u>Liquidated Damages</u>. The parties acknowledge and agree that damages which will result to the Executive for termination by the Company of the Executive's employment shall be extremely difficult or impossible to establish or prove, and agree that the amounts payable to the Executive (if any) under Section 9(d) or 9(e), as applicable (the "<u>Severance Payments</u>") shall constitute liquidated damages for any such termination.

(h) <u>Full Discharge of Company Obligations</u>. In the event of any breach of this Agreement by the Company, the Executive shall be entitled to the lesser of (i) the amount of damages incurred by the Executive as a direct result of each breach and (ii) the Severance Payments the Executive would be entitled to under Section 9(d) if her employment were terminated thereunder. The amounts payable to Executive following termination of the Employment Period or upon any actual or constructive termination of the Executive's employment pursuant to this Section 9 shall be in full and complete satisfaction of Executive's rights under this Agreement and any other claims she may have in respect of her employment by the Company or any of its Affiliates, and Executive acknowledges that such amounts are fair and reasonable, and her sole and exclusive remedy, in lieu of all other remedies at law or in equity, with respect to the termination of her employment hereunder. Payment of any Severance

9

Payment pursuant to Section 9(d) or 9(e), as applicable, shall be conditioned upon (x) Executive's execution and non-revocation of a release in a form substantively identical in terms to the form attached as Exhibit A and (y) Executive's compliance with the provisions set forth in Section 7 hereof.

(i) <u>Section 409A</u>. To the extent the Executive would be subject to the additional 20% tax imposed on certain deferred compensation arrangements pursuant to Section 409A of the Code as a result of any provision of this Agreement, such provision shall be deemed amended to the minimum extent necessary to avoid application of such tax and the parties shall promptly execute any amendment reasonably necessary to implement this Section 9(i).

10. (Intentionally left blank)

11. <u>Notices</u>. All notices, demands, requests, or other communications which may be or are required to be given or made by any party to any other party pursuant to this Agreement shall be in writing and shall be hand delivered, mailed by first-class registered or certified mail, return receipt requested, postage prepaid, delivered by overnight air courier, or transmitted by facsimile transmission addressed as follows:

(i)    If to the Company, to:

Biomet, Inc.
56 E. Bell Drive
P.O. Box 587
Warsaw, Indiana 46581-0587

Attn: Chief Legal Officer
Facsimile Number: (574) 267-8137

(ii)    If to the Executive, to the address last shown on the Company's Records.

Each party may designate by notice in writing a new address to which any notice, demand, request or communication may thereafter be so given, served or sent. Each notice, demand, request, or communication that shall be given or made in the manner described above shall be deemed sufficiently given or made for all purposes at such time as it is delivered to the addressee (with the return receipt, the delivery receipt, confirmation of facsimile transmission or the affidavit of messenger being deemed conclusive but not exclusive evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation.

12. <u>Severability</u>. The invalidity or unenforceability of any one or more provisions of this Agreement shall not affect the validity or enforceability of the other provisions of this Agreement, which shall remain in full force and effect.

13. <u>Effect on Other Agreements</u>. The provisions of this Agreement shall supersede the terms of any plan, policy, agreement, award or other arrangement of the Company (whether entered into before or after the Effective Date) to the extent application of the terms of this Agreement is more favorable to the Executive.

10

14. <u>Survival</u>. It is the express intention and agreement of the parties hereto that the provisions of Sections 7, 9, 11, 12, 13, 14, 15, 16, 17, 19, 20, 22 and 23 hereof shall survive the termination of employment of the Executive.

15. <u>Assignment</u>. The rights and obligations of the parties to this Agreement shall not be assignable or delegable, except that (i) in the event of the Executive's death, the personal representative or legatees or distributees of the Executive's estate, as the case may be, shall have the right to receive any amount owing and unpaid to the Executive hereunder and (ii) the rights and obligations of the Company hereunder shall be assignable and delegable in connection with any subsequent merger, consolidation, sale of all or substantially all of the assets or equity interests of the Company or similar transaction involving the Company or a successor corporation. The Company shall require any successor to the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

16. <u>Binding Effect</u>. Subject to any provisions hereof restricting assignment, this Agreement shall be binding upon the parties hereto and shall inure to the benefit of the parties and their respective heirs, devisees, executors, administrators, legal representatives, successors and assigns.

17. <u>Amendment; Waiver</u>. This Agreement shall not be amended, altered or modified except by an instrument in writing duly executed by the party against whom enforcement is sought. Neither the waiver by either of the parties hereto of a breach of or a default under any of the provisions of this Agreement, nor the failure of either of the parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder, shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any such provisions, rights or privileges hereunder.

18. <u>Headings</u>. Section and subsection headings contained in this Agreement are inserted for convenience of reference only, shall not be deemed to be a part of this Agreement for any purpose, and shall not in any way define or affect the meaning, construction or scope of any of the provisions hereof.

19. <u>Governing Law</u>. This Agreement, the rights and obligations of the parties hereto, and any claims or disputes relating thereto, shall be governed by and construed in accordance with the laws of the State of Indiana (but not including any choice of law rule thereof that would cause the laws of another jurisdiction to apply). Except as otherwise provided in Section 7(g), each of the parties agrees that any dispute between the parties shall be resolved only in the courts of the State of Indiana or the United States District Court for the Northern District of Indiana and the appellate courts having jurisdiction of appeals in such courts. In that context, and without limiting the generality of the foregoing (but subject to Section 7(g)), each of the parties hereto irrevocably and unconditionally (a) submits for himself/herself or itself in any proceeding relating to this Agreement or Executive's employment by the Company or any of its Affiliates, or for the recognition and enforcement of any judgment in respect thereof (a "<u>Proceeding</u>"), to the exclusive jurisdiction of the courts of the State of Indiana, the court of the United States of America for the Northern District of Indiana, and appellate courts having jurisdiction of appeals from any of the foregoing, and agrees that all claims in respect of any such Proceeding shall be

11

heard and determined in such Indiana State court or, to the extent permitted by law, in such federal court; (b) consents that any such Proceeding may and shall be brought in such courts and waives any objection that he/she or it may now or thereafter have to the venue or jurisdiction of any such Proceeding in any such court or that such Proceeding was brought in an inconvenient court and agrees not to plead or claim the same; (c) waives all right to trial by jury in any Proceeding (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or Executive's employment by the Company or any of its Affiliates, or her, or its, performance under or the enforcement of this Agreement; (d) agrees that service of process in any such Proceeding may be effected by mailing a copy of such process by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at her, or its, address as provided in Section 11; and (e) agrees that nothing in this Agreement shall affect the right to effect service of process in any other manner permitted by the laws of the State of Indiana.

20. Entire Agreement. This Agreement constitutes the entire agreement between the parties respecting the employment of the Executive and supersedes all other agreements and understandings.

21. Counterparts. This Agreement may be executed in two counterparts, each of which shall be an original and all of which shall be deemed to constitute one and the same instrument.

22. Withholding. The Company may withhold from any benefit payment under this Agreement all federal, state, city or other taxes as shall be required pursuant to any law or governmental regulation or ruling.

23. Definitions.

"Accrued Benefits" means (i)(A) any vested compensation deferred by the Executive prior to the Date of Termination and not paid by the Company; (B) any amounts or benefits owing to the Executive or to the Executive's beneficiaries under the then applicable benefit plans of the Company; and (C) any amounts owing to the Executive for reimbursement of expenses properly incurred by the Executive prior to the Date of Termination and which are reimbursable in accordance with Section 6; and (ii) if the Executive's employment is terminated during the Employment Period (A) other than by the Company for Cause and other than by the Executive without Good Reason and (B) prior to the Company's payment to her of her an annual incentive bonus, if any, under the Annual Plan for the fiscal year immediately preceding the fiscal year that contains the Date of Termination, the amount of such annual incentive bonus.

"Affiliate" means, with respect to any entity, any other corporation, organization, association, partnership, sole proprietorship or other type of entity, whether incorporated or unincorporated, directly or indirectly controlling or controlled by or under direct or indirect common control with such entity, provided that none of the Majority Stockholders shall be deemed to be an Affiliate of the Company for purposes of this Agreement solely by reason of its ownership interest in the Company, and provided further that no company that is wholly or partially owned by any Majority Stockholder shall be deemed to be an Affiliate of the Company solely by reason of such Majority Stockholder's ownership interest therein.

12

"Board" means the Board of Directors of the Company.

"Cause," when used in connection with a termination of the Executive's employment, shall mean, unless otherwise provided in any applicable equity award grant agreement entered into between the Company and the Executive with respect to any equity awards that may be granted to the Executive, the termination of the Executive's employment with the Company and all of its Affiliates on account of (i) a failure of the Executive to substantially perform her duties (other than as a result of physical or mental illness or injury) that has continued after the Company has provided written notice of such failure and the Executive has not cured such failure within 30 days of the date of such written notice, provided that a failure to meet financial performance expectations shall not, by itself, constitute a failure by the Executive to substantially perform her duties; (ii) the Executive's willful misconduct or gross negligence; (iii) a willful or grossly negligent breach by a Executive of the Executive's fiduciary duty or duty of loyalty to the Company or any of its Affiliates; (iv) the commission by the Executive of any felony or other serious crime involving moral turpitude; (v) a material breach of the Executive's obligations under any agreement entered into between the Executive and the Company or any of its Affiliates, which, if such breach is reasonably susceptible to cure, has continued after the Company has provided written notice of such breach and the Executive has not cured such failure within 30 days of the date of such written notice; or (vii) a material breach of the Company's written policies or procedures that have been communicated to the Executive and that causes material harm to the Company or its business reputation.

"Change of Control" shall mean the occurrence of any of the following events after the Effective Date: (i) any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) of all or substantially all of the assets of the LVB Acquisition, Inc. on a consolidated basis to any Person or group of related persons for purposes of Section 13(d) of the Securities Exchange Act of 1934, as amended (a "Group"), together with any Affiliates thereof other than to a Majority Stockholder; (ii) the approval by the holders of the outstanding voting power of LVB Acquisition, Inc. of any plan or proposal for the liquidation or dissolution of LVB Acquisition, Inc.; (iii) (A) any Person or Group (other than the Majority Stockholder) shall become the beneficial owner (within the meaning of Section 13(d) of the Securities Exchange Act of 1934, as amended), directly or indirectly, of common stock of either the Company or LVB Acquisition, Inc. (or any intermediary entity between the Company and LVB Acquisition, Inc.) representing more than 40% of the aggregate outstanding voting power of the Company, LVB Acquisition, Inc. or such intermediary entity, as applicable, and such Person or Group actually has the power to vote such common stock in any such election and (B) the Majority Stockholder beneficially owns (within the meaning of Section 13(d) of the Securities Exchange Act of 1934, as amended), directly or indirectly, in the aggregate a lesser percentage of the voting power of the Company or LVB Acquisition, Inc. (or any intermediary entity between the Company and LVB Acquisition, Inc.), as applicable, than such other Person or Group; (iv) the replacement of a majority of the Board over a two-year period from the directors who constituted the Board at the beginning of such period, and such replacement shall not have been approved by a vote of at least a majority of the Board then still in office who either were members of such Board at the beginning of such period or whose election as a member of such Board was previously so approved or who were nominated by, or designees of, a Majority

13

Stockholder; (v) consummation of a merger or consolidation of the LVB Acquisition, Inc. with another entity in which holders of the common stock of LVB Acquisition, Inc. immediately prior to the consummation of the transaction hold, directly or indirectly, immediately following the consummation of the transaction, less than 50% of the common equity interest in the surviving corporation in such transaction and the Majority Stockholder does not hold a sufficient amount of voting power (or similar securities) to elect a majority of the surviving entity's board of directors or (vi) a merger, recapitalization or other direct or indirect sale by the Majority Stockholder (including through a public offering) of common stock of LVB Acquisition, Inc. that results in more than 80% of the common stock of LVB Acquisition, Inc. (or any resulting company after a merger) owned, directly or indirectly, by the Majority Stockholder immediately following the Closing, no longer being so owned by the Majority Stockholder. For purposes of the preceding sentence, "Closing" shall mean the closing of the merger of the Company with LVB Acquisition Merger Sub, Inc. pursuant to the Merger Agreement.

"Company Confidential Information" means information known to the Executive to constitute trade secrets or proprietary information belonging to the Company or other Company confidential financial information, operating budgets, strategic plans or research methods, personnel data, projects or plans, or non-public information regarding the Company or any Affiliate of the Company, in each case, received by the Executive in the course of her employment by the Company or in connection with her duties with the Company.

"Date of Termination" means (i) if the Executive's employment is terminated by the Executive's death, the date of the Executive's death; (ii) if the Executive's employment is terminated because of the Executive's Disability pursuant to Section 8(b)(i), 30 days after Notice of Termination, provided that the Executive shall not have returned to the performance of the Executive's duties on a full-time basis during such 30-day period; or (iii) if the Executive's employment is terminated for any reason other than the Executive's death or Disability, the date specified in the Notice of Termination, which in the case of a termination of employment by the Executive may not be less than 90 days following the date the notice is provided.

"Extended Term" shall have the meaning set forth in Section 2.

"Good Reason" shall mean, unless otherwise provided in any applicable equity award grant agreement entered between the Company or LVB Acquisition, Inc. and the Executive with respect to any equity awards that may be granted to the Executive, the occurrence of the following without the Executive's consent (i) a material diminution in the Executive's duties and responsibilities as of the Effective Date, other than a change in such Executive's duties and responsibilities that results from becoming part of a larger organization following a Change in Control; (ii) a decrease in a Executive's base salary or bonus opportunity as of the Effective Date, other than a decrease in base salary or bonus opportunity that applies to a similarly situated class of employees of the Company or its Affiliates; or (iii) a relocation of a Executive's primary work location more than 50 miles from the Executive's work location on the Effective Date, without the Executive's prior written consent; provided that, within thirty days following the occurrence of any of the events set forth herein, the Executive shall have delivered written notice to the Company of her intention to terminate her employment for Good Reason, which notice specifies in reasonable detail the circumstances claimed to give rise to the Executive's right to terminate employment for Good Reason, and neither the Company nor LVB Acquisition, Inc. shall not have cured such circumstances within thirty days following the Company's receipt of such notice.

14

"Majority Stockholder," for purposes of this Agreement, shall mean, collectively or individually as the context requires, Blackstone Group, L.P., The Goldman Sachs Group, Inc., Kohlberg Kravis Roberts & Co., TPG Capital, L.P. and their respective Affiliates.

"Non-Compete Period" means the period commencing on the Effective Date and ending eighteen (18) months after the earlier of the expiration of the Employment Period or the Executive's Date of Termination.

"Person" means an individual, partnership, corporation, limited liability company, unincorporated organization, trust or joint venture, or a governmental agency or political subdivision thereof.

IN WITNESS WHEREOF, the undersigned have duly executed and delivered this Agreement, or have caused this Agreement to be duly executed and delivered on their behalf.

BIOMET, INC.

By:     /s/ Bradley J. Tandy
Name: Bradley J. Tandy
Title:   Senior Vice President,
          General Counsel and Secretary

EXECUTIVE

          /s/ Robin T. Barney
Name: Robin T. Barney

15

EXHIBIT A TO EMPLOYMENT AGREEMENT

## EXHIBIT A

## RELEASE OF ALL CLAIMS

This Release of All Claims ("Release") has been signed by Robin Barney ("Executive") on the date indicated below.

### Background

A. The Executive and Biomet, Inc. ("Company") previously entered into an Employment Agreement, dated September 2, 2008 ("Agreement"), which provides for the payment of benefits to the Executive under certain circumstances following her termination of employment.

B. The Executive's employment with the Company terminated/will terminate on _____, thereby entitling her to payments under the Agreement, subject to the terms thereof.

C. The Company's obligations under the Agreement are contingent on the Executive signing and providing this Release to the Company within 21 days after receiving it and allowing this Release to become effective as provided herein.

D. As a condition of receiving benefits under the Agreement, the Executive wishes to sign this Release.

In consideration of the premises and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Executive agrees as follows:

1. If the Executive (i) signs and dates this Release and submits it to the Company not later than 21 days after it is provided to the Executive, (ii) complies with the other requirements of this Release and the Agreement, (iii) and does not provide written revocation of this Agreement to the Company within the seven-day revocation period referred to in Paragraph 8, the Company shall make the payments and pay the benefits required by the Agreement.

2. In consideration of the Company's payment obligations under this Agreement, the Executive releases and forever discharges the Company, all of its past and/or present divisions, Affiliates, officers, directors, shareholders, partners, trustees, employees, agents, representatives, administrators, attorneys, insurers, fiduciaries, successors, and assigns, in their individual and/or representative capacities (hereinafter collectively referred to as "Employer"), from any and all causes of action, suits, agreements, promises, damages, disputes, controversies, contentions, differences, judgments, claims, and demands of any kind whatsoever, including any claims based on allegations of wrongful discharge, and/or breach of contract ("Claims") that the Executive and/or her heirs, executors, administrators, successors, and assigns has or may have ever had, has or may now have, or may have against the Employer by reason of the Executive's employment or before the date on which the Executive signed this Release, other than (i) a Claim that the

16

Company has failed to pay the Executive the payment described in or contemplated by the Agreement or has otherwise breached the terms of the Agreement, or (ii) a Claim that the Company has failed to pay the Executive any vested benefits to which the Executive is entitled under a plan or program of the Company (collectively, "Excluded Claims"). The Executive gives this Release regardless of whether the Claims are known or unknown. Such released Claims include, without limitation, any and all Claims under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the Civil Rights Act of 1871, the Civil Rights Act of 1991, the Fair Labor Standards Act, the Employee Retirement Income Security Act of 1974, the Americans with Disabilities Act, the Family and Medical Leave Act of 1993, all as amended, and any and all other applicable federal, state or local laws, statutes, rules, and regulations pertaining to employment, as well as any and all Clams under state contract or tort law including, but not limited, to those based on allegations of wrongful discharge, breach of contract, promissory estoppel, defamation, and infliction of emotional distress. The Executive also agrees that her rights under the aforementioned statutes or any other federal, state, or local law, rule or regulation are effectively waived by this Agreement. For purposes of this Agreement, the term "Affiliates" means any other entity that, directly or indirectly, controls, is controlled by, or is under common control with, Biomet and all employee benefit plans (and fiduciaries of such plans) sponsored by any of such entities.

3. The Executive agrees that if this Release is ever held to be invalid or unenforceable (in whole or in part) as to any particular type of claim or as to any particular circumstance, it shall remain fully valid and enforceable as to all other claims and circumstances.

4. The Executive represents that she has not filed, and will not hereafter file, any lawsuit against the Employer relating to her employment and/or cessation of employment with the Employer, or otherwise involving facts that occurred on or before the date on which she signed this Release, other than with respect to any Excluded Claims.

5. The Executive understands and agrees that if he/she commences, continues, joins in, or in any other manner attempts to assert any lawsuit released herein against the Employer, or otherwise violates the terms of this Release, he/she shall be required to return all payments paid to her by the Company pursuant to the Agreement (together with interest thereon), and he/she agrees to reimburse the employer for all attorneys' fees and expenses incurred by Employer in defending against such a lawsuit, provided that the right to receive such payments is without prejudice to the Employer's other rights hereunder, including any release of any and all Claims (other than the Excluded Claims) against the Employer.

6. The Executive understands and agrees that the Company's payments to her and the signing of this Release do not in any way indicate that he/she has any viable Claims against the Employer or that the Employer admits any liability to her whatsoever.

7. In signing this Agreement, the Executive warrants that, to the extent that he/she is aware of any potential or suspected violations of Biomet's Code of Business Conduct and Ethics, Fraud and Abuse Compliance Policies, and Anti-Corruption Policy (collectively Biomet's "Business Ethics Policies") and other applicable laws, including the Federal Anti-Kickback Statute, the False Claims Act, and the Stark laws, the Executive has reported such potential or suspected violations to the appropriate personnel of Employer.

17

8. As part of the consideration being provided to Executive under this Release and the Agreement, the employer expects Executive to make herself reasonably available to Employer and/or its legal counsel and other designated representatives or agents through the twelve (12) month period following the execution of this Release. As a result, the Executive agrees to the following:

a. Respond to the best of Executive's ability to reasonable inquiries from Employer concerning ongoing matters within executive's knowledge and/or former area of responsibility and to assist Employer in transitioning those matters to other personnel; and

b. To fully cooperate with Employer and/or its legal counsel and other designated representatives or agents in providing information in connection with threatened, pending or future investigations or litigation, including giving depositions and appearing for live interviews and proceedings. The Employer shall be responsible to pay Executive, outside of the payment set forth in the Agreement, (after the submission of a written expense report) for all out-of-pocket expenses for travel, lodging, meals and related expenses incurred by Executive in providing the services contemplated in this Section 8.b. Such travel and services must be specifically requested by employer;

9. Executive agrees not to make any statement, which a reasonable person would consider disparaging to Employer or its Affiliates and their officers, directors or employees. The provisions of this paragraph shall remain in full force and effect for one year from the execution of this Release.

10. The Executive shall continue to be entitled to any rights to indemnification under the Company's directors and officers liability insurance, Articles of Incorporation and Bylaws with respect to any claims relating to the Executive's employment with Employer.

11. The Executive has read this Release carefully, has been given at least 21 days to consider all of its terms, has been advised to consult with an attorney and any other advisors of her choice, and fully understands that by signing below she is giving up any right that she may have to sue or bring any Claims (other than the Excluded Claims) against the Employer. The Executive has not been forced or pressured in any manner whatsoever to sign this Release, and she agrees to all of its terms voluntarily.

12. The Executive understands that she has seven days from the date on which she signed this Release below to revoke this Release by notifying the Company of her revocation, that this Release will not become effective until the eighth day following the date on which she has signed this Release, and that if she revokes this Release within such period, the Agreement shall be void. Further, if Executive revokes this Release within the seven-day revocation period, then Executive shall be obligated to pay to Employer any gain realized from the exercise of stock options that have been accelerated pursuant to the terms of the Agreement. "Gain realized" shall be calculated based on the market price of Biomet Common Shares as of close of business on the date of exercise.

18

13. The Executive understands and agrees that this Release will be governed by the internal laws of the State of Indiana, without regard to conflict of law principles, to the extent not preempted by federal law.

_____

Date

_____

Signature

Robin T. Barney
_____

Printed Name

19

USDC IN/ND case 3:19-cv-00546-PPS-MGG   document 1-1   filed 05/14/19   page 35 of 35

**Exhibit 10.18.1**

## FIRST AMENDMENT TO EMPLOYMENT AGREEMENT

This First Amendment to Employment Agreement (the "Amendment") is made this 31st day of December 2008 between BIOMET, INC., an Indiana corporation ("Biomet"), and Robin T. Barney ("Executive"). All capitalized terms used herein shall have the meanings ascribed to them in the Employment Agreement (defined below), unless otherwise defined herein.

WHEREAS, Biomet and Executive entered into that certain Employment Agreement dated as of September 2, 2008 (the "Employment Agreement"); and

WHEREAS, Biomet and Executive desire to amend the Employment Agreement on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Biomet and Executive hereby agree as follows:

1. Section 9(e): Termination by the Company Other Than For Cause, Death or Disability, or by the Executive for Good Reason, Following a Change of Control. Section 9(e)(i) of the Employment Agreement is hereby amended to delete the final sentence of Section 9(e)(i) in its entirety and replace it with the following:

"The total amount of the Change of Control Severance Benefit will be paid: (1) if the Change in Control constitutes a change in control event within the meaning of Treasury Regulation 1.409A-3(i)(5), in a lump sum as soon as administratively practicable (but in no event later than 30 days) following the Date of Termination or (2) if the Change of Control does not constitute a change in control event within the meaning of Treasury Regulation 1.409A-3(i)(5), in equal, ratable installments in accordance with the Company's regular payroll policies over the course of the Non-Compete Period."

2. Miscellaneous. Except as expressly modified by this Amendment, the Employment Agreement shall remain in full force and effect. This Amendment may be executed in two (2) or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have executed this First Amendment to Employment Agreement on the date first set forth above.

BIOMET, INC.

By: /s/ Bradley J. Tandy
    Bradley J. Tandy
    Senior Vice President,
    General Counsel & Secretary

EXECUTIVE

    /s/ Robin T. Barney
Name: Robin T. Barney